Mr. Steigman, you have three minutes for rebuttal. Mr. Steigman, you may proceed. Good morning, your honors. May it please the court. Todd Steigman appearing on behalf of the plaintiff, Dr. Bandy Lee. This court should reverse the district court's ruling dismissing the plaintiff's claims for breach of contract, breach of the covenant of good faith and fair dealing, and violation of section 3151Q of the Connecticut general statutes and vacate the judgment that was entered in the district court on behalf of the defendant. I'd like to begin by focusing on the breach of contract claim. The district court misunderstood plaintiff's claim and construed plaintiff's claim in ways that did not conform to the allegations made in plaintiff's actual complaint. So when the district court ruled that plaintiff's contract claim failed to state a claim, it did so with respect to a claim that plaintiff did not actually assert in her complaint. Even if we assume, even if we agree with you on that, that the claim isn't quite the way it was framed by the district court, but the essence of the claim, you still have to prove or allege, plausibly allege, a promise not to take action based on the exercise of free speech. Is that right? That's still, that is still part of the claim. So we still, so I'll concede to the court that we have to, not only do we have to show that the district court made errors, but also that within the context of the allegations that the plaintiff did make, there is a plausible claim that states a claim for breach of contract as well as the other claims. And we believe that we've done that in the amended complaint, and I can walk the court through why I believe that's the case. So first, the handbook, the faculty handbook that's part of the record, includes a very clear policy on free expression using mandatory language. Doesn't the handbook also say that no adjunct appointment is permanent, that it has to be reappointed, that the holder has to be reappointed at the end of the time period? Yes, I agree with the court that there is no guaranteed reappointment, but for reasons we explained in the briefing, and I can address further with your honor this morning, we don't believe that the absence of a guaranteed promise of reappointment is fatal to the plaintiff's claim for several reasons. Why not? So Connecticut law is clear, and we believe that we cited some cases in our briefing to support this proposition, that a promise can take the form of an agreement or a limitation that the decision will not be based on certain criteria. And so the Gladio case is one of those. We cited a number of cases in our briefing about that. And we've also cited a number of cases in which, particularly in the academic sphere, breach of contract claims have been allowed to proceed in the absence of promises of reappointment or tenure, for instance. So the Hartwig case, decided by former District Court Judge Droney, is one case where the professor was working on a series of annual one-year appointments. He was non-renewed. He was still allowed to bring a breach of contract claim based on the non-renewal in the absence of a guaranteed reappointment. The Crane case that was decided by the Connecticut Supreme Court involved a decision to not grant somebody tenure. Obviously, nobody has a guaranteed right to tenure, but there's a number of cases in Connecticut that we've cited in our briefing that in the absence of a guarantee promise that somebody's automatically entitled to tenure, you can still bring a breach of contract claim if the decision was based on an impermissible reason or failed to follow certain criteria and promises. And we believe that there's sufficient case law that we've cited in our briefing about that. With respect to the provision that Your Honor is probably referring to, I think it's Section 3L1 of the handbook, that also says that decisions on reappointment are subject to professional and scholarly judgment. Here, no decision can be made or accepted or found on behalf of Yale that it actually exercised professional and scholarly judgment in this case, because plaintiff alleges exactly the opposite. Plaintiff alleges that Yale acted in bad faith, that Yale acted for pretextual reasons, that Yale retaliated against her because of her public expression on matters of public concern and then offered the contents of what's referred to in the record as Dr. Crystal's letter that the district court placed a lot of emphasis on. Why would they have retaliated against her? What would be behind that? Well, because she expressed a number of matters of public concern about former President Trump. Do you have a hotbed of support for President Trump? Did I miss that? Well, I don't think we need to show that. That's not in the record about whether they are or not. But your argument is that this was motivated by a desire to retaliate against her because of these statements. So what would be the basis for the retaliation? Well, the plaintiff alleges that they did, in fact, retaliate against her, and so on a 12b6 motion that needs to be accepted as true that that was their motivation. Well, that's a legal conclusion. I mean, what are the facts that would support an inference that this is retaliatory? Well, I think that the allegations in the complaint also refer to a number of documents in the record in which connections are made between plaintiff's public statements and the decision to not renew her. So Dr. Kristol's letter cannot be accepted for the truth as it relates to Yale's asserted reasons for his decision. But it's clear that can be accepted that he did say these things in these communications. And they're in the complaint. They're also in the record to the extent that the district court accepted some of these communications by Dr. Kristol. So you're not necessarily alleging that the administration did this because they didn't agree with or like the content, but perhaps because the content was controversial and subjected the university to controversy it didn't want. So I think both of those things could be true, and those are things that like lots of employment discrimination retaliation claims need to be cited on the full record. So let's get back to what I at least in my view is sort of the narrow nut of this case, which is is there a place either by inference or direct text that we can conclude that the handbook says we're not going to take, even though you're not entitled to renewal, we're not going to make that decision based on an impermissible consideration, and one impermissible consideration would be your valid exercise of your free speech rights, your academic freedom. When I actually looked in the handbook, I was surprised that the policy on freedom of expression spoke in very specific terms about prohibiting intimidation, physical restriction of other members of the university, preventing orderly conduct of university functions, blocking the legitimate activity of any purpose on the campus or building. It seemed to be very much directed at prohibiting people from stepping on each other's free speech. I'm trying to find where in the handbook the university says, and we as a university are not going to step on the free speech of our non-tenured faculty. So, Your Honor, thank you for the opportunity to address that point further. So in that same policy, there's an italicized block quote that begins the policy. We believe that that italicized block quote has to be given meaning. It can't be just surplusage. And so there's broad mandatory language in there about the need and necessity and must protect freedom of expression. A free interchange of ideas is necessary not only within the university's walls, but with the world beyond as well. And that's the statement from the Woodward report that's quoted in the handbook. You think that's contractual language? That rises to the level of contractual language? I think that on a full record, when we wouldn't be limited to just that handbook, and consistent with Connecticut law when contract decisions are made by the fact finder, that that handbook, in addition to other facts that we could put into the record, are sufficient to state a claim. And I don't think we need to make a specific connection within that language itself that connects it to reappointment decisions. I think if you take a step back and look at the purpose and the intent and what people's reasonable expectations would be of that language, which is, from the plaintiff's perspective, how the breach of contract claim needs to be assessed based on reasonable expectations, that a decision to non-renew somebody's appointment, specifically because of their free expression, is definitely going to have a chilling effect on free expression. So therefore, it should constitute a violation of the policy if a non-renewal is made specifically in ways that would have an effect of chilling people's speech. I would also, on this point, like to bring the Court's attention to the Crane case. Well, we're a little bit over, so maybe just very quickly. I'll make it very brief, Your Honor. So in the Crane case, part of the breach of contract claim that the Connecticut Supreme Court upheld in that case was based on the failure of the Trinity College to uphold its affirmative action policy. It was a general policy, not specific to tenure decisions. But in that case, the Connecticut Supreme Court, after a full trial, said that the failure to adhere and apply the broad general affirmative action policy was sufficient to state a breach of contract claim in connection with the plaintiff's tenure case. So that's cited in our briefing, and I reserve the rest of my time for rebuttal. So you've reserved three minutes for rebuttal. So we'll now hear from Mr. Fryman or Freeman? Mr. Fryman. Okay. Good morning, Your Honors. May it please the Court. I think the Court was appropriately focusing over the last few minutes about what the promise is. Where is the sufficiently definite contractual promise in the handbook that was allegedly violated in the amended complaint? That's alleged to have been violated in the amended complaint. And we know, as the panel has noted, that the contract itself, the faculty handbook itself, states quite clearly that there is no right to reappointment. And I want to make clear that it says that in multiple places. It says that in the general provisions. It also says that with regard to the medical school in particular. But that's not inconsistent with the notion that even if there's no right to reappointment, there may be grounds on which it would be impermissible to decline to reappoint someone. Certainly there are statutory grounds. A person can fall within a protected category. And it may be that there's another provision of the contract that provides another promise that somewhere it says, even though you don't have a right to reappoint you, we won't not reappoint you for reasons X, Y, and Z. So is it Yale's position that, and this would apply, I suppose, to any non-tenured faculty, because all non-tenured faculty, not just voluntary faculty, are subject to reappointment periodically, if I'm understanding that right. So it's Yale's position that for non-tenured faculty there is no promise, implied or otherwise, that faculty will not be subject to non-reappointment in response to their exercise of their free speech. Well, that's correct, Your Honor. That is that the free speech policy in the handbook has the specific provisions that you noted a few minutes ago. Those are quite concrete. They satisfy Connecticut law. They are contractual promises. The broader provisions that Your Honor noted are not sufficiently definite to constitute promises under Connecticut law. Let me note, though, there's an important distinction here. We are talking about someone who is in the voluntary faculty ranks in the medical school. But your argument is, there's nothing about your argument that's limited to that, right? When you're saying, when you're telling us what that contract provides as to the reasons for non-appointment, there's no principle distinction in the structure of the contract between voluntary faculty and non-tenured faculty. That's correct, Your Honor. But I was going to add an additional point, which is an important distinction that the handbook makes. There are robust procedural protections that are available to tenured track faculty, to people who are not volunteer faculty in the medical school, which is a special category that's called out in the footnote of the handbook. There's thousands of them in the medical school. They're essentially community practitioners who teach med students at bedside as part of their treating of patients. It's an entirely different category of people. And those robust procedural protections that the handbook gives to people who are not within that called out category, ensure that their peers are going to consider things. Now, speech is necessarily part of what a university has to look at in deciding whether to hire someone, whether to retain someone, whether to advance someone. That's the heart of academia, right? What do you say? What do you say to your students? What do you say in a journal? What do you say in your article? Counsel, you're saying that this plaintiff had no procedural protections? That's correct. There were no procedural protections here. As a matter of fact, they brought a procedural protection clause initially in the district court and chose not to pursue it in response to our motion to dismiss, because it was clear that the handbook does not give them these procedural protections. They can't go and ask for a committee review, et cetera, in the way that tenured track faculty can. These are people who aren't paid. You know, I think that's important to note here. It was not without value to Dr. Lee. Wasn't the appointment valuable to her? If Your Honor is switching now to the 3151Q question, I would say there may well have been incidental benefits that she received from her appointment. I think certainly people choose to affiliate as volunteers with Yale because they believe they derive some kind of benefit from that. Didn't she get her grants based on her affiliation with Yale University? She alleges that she got grants as a basis of her affiliation, but she does not allege that she got grants that came to Yale and that she was paid out of. She certainly does not allege that she got any grants. No. As an individual, she applied for grants and got them, and it made a difference to the granting agency that she was affiliated with Yale University. Right. That's why people choose to volunteer their time, is they can get other things. Like she got consulting gigs for the World Health Organization. Other people paid her. Other people gave her money, whether it's a grant organization or a company that's paying her to do something. So that inured to her benefit in the sense that- If this doctor had the procedural protections that non-tenured faculty has, would she still have been in a position of non-reappointment? I'm sorry, Your Honor, I'm not following the question. Would she still not have been appointed, reappointed? If she had had procedural protections? If she had any procedural protections. We're speculating, Your Honor, but I think it's easy to speculate that based on what we see in the record, she would not have been reappointed and that there would have been a committee that would have looked at it and said, fine. So I don't think there's any reason to think that the procedural protections mattered in her particular case. But as to the question of whether tenure-track faculty have protections, they do. But again, procedural protections give you a process, but you still have to have a substantive right to vindicate through that process. And if I'm understanding your argument, like when I look at a dictionary, right, academic freedom, freedom to learn without interference or teach without interference as by government officials, Black's Law, the right of a- especially of a university teacher to speak freely about political or ideological issues without fear or loss of position or other reprisal. I think what I'm hearing you say is that's an important concept, but it is not- that understanding of academic freedom is not embodied in our contractual arrangements with our non-tenured faculty. They may have procedural protections, but the substantive protection that they can vindicate through that procedural protection does not include the freedom to speak out about controversial ideological matters. That's correct. The protections that they do have under the university's statement on academic freedom include the substantive protections to be free from intimidation, coercion, etc. That is, no one can stop them from lecturing in their lecture hall. No one can stop them from giving a guest lecture. No one can shout them down in the middle of their presentation just because they don't like the content of their speech. So there are substantive protections. But the university can essentially shout them down by not renewing their appointment. Well, that's not shouting them down. That's simply not giving them another term, Your Honor. Okay. And because there is no right to reappointment, as the contract makes clear, there's no reason there's substantive right of not intimidating that adheres in one term would be something that necessarily must have application after the term has ended. What we have here essentially is this was a term at will volunteer arrangement that opposing counsels tried to transform into a kind of for cause employment agreement. But that's not what it is. There's no right to reappointment. There's no promise that decisions on reappointment will be made regardless of the content of speech that a volunteer faculty member in the medical school has engaged in. The university has the right to choose whether or not to reappoint. Counsel, do you believe that this doctor had no property interest at all in reappointment? There's no allegation of any property interest, and I don't believe there could be, Your Honor. This is a contractual arrangement, and the contract sets out what the rights are. She alleges that she had access to things like an office and administrative support and databases and libraries under the Connecticut Supreme Court's decision in Echo Hose. It's clear that those are incidental benefits. The test which the Connecticut Supreme Court borrows from this Court's decisions in York and O'Connor, as well as the Fifth Circuit decision in Juneau, says that someone who's claiming to be an employee who's not being paid in order to satisfy the remuneration test has to satisfy two separate requirements. One, the benefits have to be not incidental to the activity performed. Well, an office, access to a database, of course that's incidental to the work as a volunteer faculty member. But second of all, above and beyond that, they have to be not only not incidental but also have to be substantial. So, for instance, this Court in the Pietras decision said, well, okay, when we're talking about someone who has a pension benefit, even though they're not getting a salary, plus various sorts of insurance, the District Court did not clearly err in finding that those benefits were substantial and that that person was an employee notwithstanding any wages. But that's not what we have here. Here we have something much more like the Court's decision in York, which Your Honor may recall. The decision in York involved someone who sued the Bar Association here in the city and said, I had a secretary and I had an office. I'm an employee for purposes of Title VII. And this Court said, no, you don't satisfy the remuneration test. Congress could have passed protection for people who are not employees. The Connecticut legislature could pass protection for people who aren't. As a matter of fact, in Echo Hose, the Connecticut Supreme Court decision, the Connecticut Supreme Court says, look, the legislature could have said any person. They didn't. They said employee. And they specifically note, because that was a case that was, you know, they're noting troubling possibilities. It involved an intern and, you know, as someone who said that they were subject to discrimination and harassment. And the Court said, you know what, the legislature later passed a statute protecting interns from harassment. And they could do that. They could pass something with regard to volunteers. She doesn't claim protection as an intern. She wasn't an intern. But there is no statute that protects people who are volunteers with regard to the speech covered by 3151Q. And you'd have to reverse Echo Hose as well as Varley. This Court's job is clear. It's to apply the appellate precedent from the Connecticut Supreme and Appellate Courts, which is clear on the meaning of employee and employer, which, of course, are two sides of the same coin. And it's consistent with this Court's jurisprudence in York. Counsel, I don't disagree with your contractual argument. But it sure looks like she did not receive reappointment because of the content of her speech. Are you saying that's what it looks like? Your Honor, that's certainly what's pleaded. And I am not denying that that's what's pleaded. But the question is, is there a promise in the contract that says that won't be considered? And there isn't. And because there isn't, the whole notion of pretext, which opposing counsel is discussing, is irrelevant because pretext goes to the question of, did you actually do the action on the basis that you said you did the action? But it presumes a contractual promise. If there's no contractual promise in the first place, pretext is irrelevant. And as to 3151Q, the question is, is she an employee? Because if she's not, she's not within the zone of protection. And I'll just note in passing, I see that my time is up. As we noted in the last three pages of our brief, if 3151Q is applied to prohibit employers' rights to determine with whom to affiliate on the basis of speech, it presents clear constitutional questions under cases involving gas companies, newspapers, symphony orchestras, New York City parade organizations. In all of those cases, the U.S. Supreme Court as well as Federal Circuit Courts have held, you can't, by state statute or through other means, require an organization to affiliate with other people on the basis of speech. So if we're going to go there, 3151Q could potentially be facially unconstitutional. This Court should employ the Connecticut doctrine of constitutional avoidance in order not to reach that and simply to follow prior Connecticut precedent as well as this Court's precedent in finding she's not an employee under the remuneration test. Thank you, Your Honors. Thank you, Mr. Freiman. We'll now hear from Mr. Steigman for three minutes. Sir, revolve. Thank you, Your Honors. I want to go back to the issue that we were discussing before and which this Court has focused some attention on in terms of the promise made in the handbook and the free expression policy. So there is no carve-out in the free expression policy in Yale's handbook for non-tenured faculty. But I think the argument is there's nothing to carve out. There's no promise in the first place that the university won't take actions in response to the exercise of speech. Well, I think that people in the plaintiff's position, you know, non-tenured faculty, tenured faculty that have different rights than she had, reasonable expectations reading that language, nobody would discern from the policy on free expression in its broad, all-encompassing, incredibly protective language regarding free expression that Yale can terminate me because of my free expression and it will have no implication at all for the language of this policy that is so glowingly and protective using mandatory language about free expression. It's inconsistent. But you would be suggesting, I think, that this language means that the university has to basically allow professors to say whatever they want, right? Well, we acknowledge in our briefing that- If the earth is flat, would be something that would be protected under your reading, contractually protected. So we acknowledge in the briefing, Your Honor, that there are limits and the provisions of the contract would need to be reconciled and read together. And these are factual issues that, you know, should not be resolved on a 12B6 issue. So, for instance, if, unlike in this case, if somebody was teaching that the world is flat, Yale would presumably have a right to make a determination in good faith, exercising its professional and scholarly judgment under Section 3L1 of the handbook, that that person is no longer qualified to teach our students. So here, there is no fact that the court can accept as true that Yale was motivated by such a reason. The plaintiff was employed as an assistant clinical professor, not a volunteer, an assistant clinical professor, for 17 years. The record is devoid of any concerns about her actual teaching, what she instructed students. And we think that there are ways in order to reconcile differing provisions of the handbook, while you can enforce the protections on freedom of expression in the policy that we've placed a lot of emphasis, while still not infringing upon Yale's rights under Section 3L1 to make decisions based on its professional and scholarly judgment. But here, based on this record, there is no fact that the court can accept as true that Yale was actually motivated by academic and professional judgment. This case cannot be resolved without deciding competing versions of facts. What motivated Yale? Did Yale retaliate against plaintiff because of her expressions on public concern, and then offer false and pretextual justifications in bad faith in an arbitrary and capricious way? If the answer is yes, then Yale's actions to non-renew plaintiff's appointment violate the contract and the policy on freedom of expression, because they would chill somebody like plaintiff from exercising her free expression on matters of public concern. All right. Well, thank you both. We will reserve decision.